Mr. Kaufman, we'll hear from you first. Thank you, Your Honor, and may it please the Court. This case is about a sprawling system of lifetime restrictions on the speech of millions of former government employees, including plaintiffs. The system, called pre-publication review, or PPR, is, in the words of Amici, an expansive, complex, and draconian hydra that imposes egregious and in many ways incalculable costs upon both former government employees and the public. Now, why don't we keep this case to what it is, which is four agencies involved in foreign policy and national security. We're not talking about the whole government and all the creeping pre-publication reviews that the Amici are talking about. But we're talking about the provisions by the CIA, the DOD, NSA, and the ODNI. I think it will help us to advance the argument to stick within those parameters. Absolutely, Your Honor. So as plaintiffs have pled, authors like the plaintiffs regularly wait, and speaking to the regime is at issue here, regularly wait months or even years to receive formal responses from PPR offices, sometimes rendering their speech stale because of the delay. They're commonly told they must strip their manuscripts of information that is not classified and that they did not learn during their government employment. And they often decide not to speak at all in light of the burdens associated with submission, as well as the potential for abuse created by the censor's wide-ranging discretion. In these ways, do each of the agencies in this case afford review of the agency decision? In other words, if you happen to disagree with something that is being deleted, is that something you can obtain a review on? Well, the agency is different in what sort of, what they provide. You can challenge those things, sometimes informally within the agency and sometimes by going to court. But the- Can't you always challenge them in the agency and always challenge them in court? Well, certainly you can always challenge them in court, but your honor, the absence of any real procedural mechanisms to do so in the defendant's agencies is one of the big problems of this case. And it's why plaintiffs and others are chilled from participating in the system at all. As Congress has recognized in directing the ODA and I to revise PPR policies for the four defendant agencies, as well as the rest of the government, these regimes suppress and that has enormous significance to public debates about critical national security issues by the people whose perspective the public needs to hear most. So there are four things that all defendants regimes have in common that makes them- For us to be like that argument is challenging the agency's claim of national security and secrecy. In other words, if you take the position that the public would be well served by knowing how we handle national security secrets and so forth about that, that challenges the whole policy of national security. But the question here is when an employee goes into a national security agency, they know they're going into a place that is developing and collecting data and has secrets and they sign documents that say they know that. And they also know that they're not allowed to take any data from the agency or publish it without prior permission. And what's wrong with doing that? The person has total free choice not to go to work for the NSA. Well, I think it's a great question and it raises essentially what this case is about and what it's not about. This case is not about whether the government may constitutionally implement some system of pre-publication review that requires authors like the plaintiffs to submit under some rules and regulations that guide the censor's determinations and make that system overall compliant with the First Amendment. Plaintiffs are not claiming that no such system could ever exist. And indeed, the SNEP case, which the government relies upon for the bulk of its argument, did not hold that any particular any any implementation of PPR is constitutional. It merely held that the facts of of pre-publication review is reasonable under the First Amendment. But it didn't speak to any of the particular features of the program of the of the regimes at issue. And it certainly didn't speak to the defendants regimes here. So just to go back to my list of four things that the defendants regimes share that make them non-compliant with the First Amendment. So first, most of the regimes assert the authority to censor information that is not classified. And all of them assert the authority to censor information that is not learned in the course of the government's employment, which is a point that your honor just raised in terms of what is acquired when these people go to work. And SNEP, Marchetti, all the lower court decisions in SNEP as well make very clear that the contracts are limited to review and censorship of information that the individual classified information that the individuals learned during the course of their employment. But none of defendants policies limit the censorship authority of the agencies to that group of things. Some allow the censorship of unclassified information. Some allow the censorship of anything. What's wrong with that? Not all information needs to be classified, yet it would be very important to someone who is. Can the council hear me? Yes, your honor. OK, my last question to you and I'll let you respond. I'm not going to amplify on it. My question was focusing on whether the information needs to be classified in order to be justified under the under the pre-publication review. And and so I'll let you address that. I've assumed that it does not need to be classified, but maybe I'm wrong on that. Well, I think under the case, under Schnapp and Marchetti, it very clearly does. And that is what the agreement doesn't go that far. And Schnapp didn't Schnapp didn't address this. Schnapp basically said national security and foreign policy is a compelling reason. But but that doesn't address the problem that information collected from within the agency can still be information. The agency does not want the enemy to know or the another country to know or the public to know. And it seems to me they can make that decision. And if you disagree, that can be appealed internally. And if you disagree from that, it can go to court. But that's that's the scheme. Well, I don't think that is the scheme, respectfully, your honor, because in Schnapp, what the court actually said in the one footnote that addressed the First Amendment question was that the agreement Schnapp signed was a reasonable means of protecting the government's interest. Now, throughout the Schnapp litigation and in Marchetti and in this case, at J54, where the CIA agreement is reproduced, the agreement, the thing that the author signed merely limits the right to review to what former employees classified information that they learned during the course of their employment. And again, that doesn't mean that the agencies don't might not have things that they consider sensitive that are not classified. But it does mean that the remedy Schnapp blessed, which is a constructive trust on profit profit and the fiduciary duty that it found existed because of the contract, only extends to classified information that the former employees learned during the course of their employment. And all of the defendant agencies go far beyond that in claiming the authority to censor. So to stand on the footnote in Schnapp and say that now we can forever and ever censor anything we determine is sensitive to our agencies, regardless of whether it's classified. Now, maybe the government's right about that in the end, but that is not what Schnapp held. It's not what this court said in Marchetti. How we can address that in this case, which is a facial challenge and we don't have a particular piece of information that you're trying to publish or not publish. We have a policy set forth in the agreement and the agency says we're going to exclude this aspect of the publication because it reveals information that would be damaging to our mission. And and and you can appeal that you say, well, that's not good enough. It doesn't fall within the contract or you can say it's unconstitutional. But and that will get reviewed. But the problem now is we're just speculating what could or could not been said. I think the bigger question is, can the pre-publication review cover non-classified information from these four agencies? Well, that is a question before the court, and that's the first reason that I've given why the policies, which are clearly in front of the court now and it's completely appropriate for plaintiffs to challenge them facially. Those policies do allow for censorship beyond the classified information. And SNEP, Marchetti, again, those cases do not even remotely say that unclassified information is a problem. That doesn't mean they're not valid just because to address it. I mean, you basically have to make an argument that pre-publication review is inapplicable to these agencies for whatever reason. I'm not sure. I haven't heard yet what your argument is. I mean, your first argument, opening argument was the public has a right to look into these agencies and see what's going on. That's the only justification I've heard so far. Respectfully, Your Honor, that's not our argument at all. The plaintiff's argument is that the public has a right to hear what former government employees have to say about pressing national security issues. Let me just concretize this for a moment. Several of our plaintiffs have made allegations that in the course of pre-publication review with the defendant agencies, they have been barred from speaking about topics that they knew nothing about and that they never learned during their government employment. So, for example, Mr. Goodman, who lost access to CIA information in 1986, was told he couldn't write about the drone program, which began 30 years later. And a system that makes no distinction between someone like Mr. Goodman and John Brennan, who ran the drone program for President Obama, which this is that is how these agencies handle those different people, is not a system that's trying at all to tailor the problem or the problem to the solution. I just I want to try to come back to my list because, well, the authority to censor non-classified information not learned in the course of government employment is one reason these regimes fail. There are three others. First or second. They lack any firm or binding deadlines. And this is a huge problem. This means that authors submit work. They don't hear from agencies for months and months on end, despite repeated harassing and inquiring with the agencies about the status of their reviews. There's no predictability to the system. And that failure means that the government discretion to put up, even if it doesn't exist, put a particular manuscript that's critical of the government in a drawer and let it just sit for months and months on end and force someone to file a lawsuit that makes that possible. And that is the kind of discretion that is not OK under the First Amendment, as well as the Fifth Amendment. Our third reason is that the regime requires submission from all former employees without regard to the sensitivity of the access of information they had during their careers or and without regard to the time that is elapsed since they've been in government, which is something I touched on it speaking about the example of Mr. Goodman. And last, all four regimes require submission of virtually anything that former employees write about the government or national security. And that is just a huge category of information. And it is that can be narrowed in multiple ways that would allow for a little more discretion and a little more fairness in the system. So these plaintiffs together have caused plaintiffs and countless others harm and the public significant harm by depriving them of the opinions of people who know a lot more about the how the agencies work and how they can and what the policies that are being implemented in the name of the United States mean. Now, that doesn't mean going out and spilling the secrets. And again, I think this speaks to what the government interest is here. The government's interest in this regime is not to prevent the leakage of classified information, not at all, because this system doesn't do that. This system does not deter a determined individual from leaking information to a reporter or if they would like publishing information themselves under their own name, because criminal penalties exist to deter exactly that kind of behavior. So not even the government claims that PPR is set up to deter that kind of spillage of inadvertent leakages of classified information. And in order to do that, the government has taken a extremely broad brush and saying anything that you submit, anything that you want to publish about national security that even touches on topics in one phrase of the DOD important to the agency needs to be submitted. And there are no rules that govern how long that submission needs to take. That means that if I want to if a former employee wants to write about a news issue that's on the front pages during a particular week of the year, there's no guarantee that they're going to be able to speak at all if the government wishes to ignore that. And indeed, CIA Director Michael Hayden in his book came up with exactly that answer. He was told by the CIA that he couldn't write about drones during a particular week. Now, this is a system that gives far too much discretion to the censors, and it can be limited in very it could be limited in ways that would bring it more into compliance with the First Amendment. And that's exactly what Congress has said. Congress has said this system is out of control. The agencies need to come up with new rules that limit things in various ways, including through having binding deadlines, limiting what censors can censor according to what the contracts have required and what SNAP and Marchetti required in the PAC cases, as well as tailoring the submission standards in terms of who needs to submit and what they need to submit. All of those things could be narrowed in a way that under the First Amendment would help tailor the actual system that affects the public and affects former employees into something that's more compliant with the First Amendment. And these are interests that are all relevant under whatever balancing test you want to use, whether it's NTU or Pickering itself. NTU is the one that applies to challenges to schemes like this that suppress speech in advance. So we submit that that is the proper standard here. But even under Pickering, I think they would come out with the same results. Now, I just want to focus on SNAP for just a moment because I know it's such a big part of the government's argument. So there's two things to say about SNAP. First, all that SNAP held was that CPR and the abstract, the existence of a system where individuals must submit for review so that the government can check for classified information is reasonable under the First Amendment. And that holding does not take care of this case at all because plaintiffs do not challenge that a system of PPR could constitutionally require them to submit some things sometimes for certain kinds of review. And the reasons we know SNAP held that are multiple, but the most important one is in the footnote, the court says the agreement was reasonable and all the agreement says is that they can check for classified information that they learned in the course of employment. Second, the courts throughout the litigation were focused on remedy and they did not hardly at all in the entire litigation touch on the particular features of the program. Last, the injunction that was approved in SNAP by the Supreme Court had a 30 day time limit to all future submissions by SNAP. None of the regimes have any kind of binding deadlines here. And this court endorsed the binding deadline in Marchetti as well. Second, even if you want to say SNAP endorsed all the features of the CIA's regime, those features don't foreclose plaintiffs challenge here because of all the things I just talked about. SNAP's case was challenged to the ability of the censor and SNAP was limited to information learned in the course of employment that was classified. SCOTUS implemented a 30 day limitation on future submission. So there was a binding deadline for all the things that had to submit. And SNAP's book plainly fell within a constitutional submission requirement, as argued by the plaintiffs here, because one, SNAP was in the inner circle of agency trust and he had left the agency just a couple of years before. So these were things that he knew from recent service and he was in the core of what the agency needed to protect. And that's remarked upon multiple times in SNAP. Last, the parties in SNAP, and you can go to the district court opinion to find this, the employment. So just reading SNAP for what it is, you know, the government isn't and I haven't done a check on this, but the contracts and the policies of these four agencies only covers what was learned in the agency, right? Well, some of the forms that the that the individual signs do, but the policies not at the CIA's policy says it can it can censor any classified information. And this becomes important. That's a different issue that covers even people on the street. But my point is, the policies that is addressed to employees reporting on what they learned while they were at the agency, right? Information. No, no, that's what that's our central our first major complaint, Your Honor, our major complaint is that that's not what policies do at all. If this court believes that that's how it should be limited, and that's what SNAP and Marchetti said as well, then the Well, that would be that would be I'm suggesting I'm not addressing classified because I think classified information is as a different justification and probably can be regulated despite employment. But I'm talking about whether an employee the extent of regulating an employee's report of information learned while in employment and not regulated, basically reviewed is what what this policy is. But okay, I we've gone over and we'll give you we've got your own rebuttal coming back. Thank you, Your Honor. All right, Mr. Winnick. Good afternoon, Your Honor. May it please the court, Daniel Winnick, government. Plaintiffs make clear in their reply brief again today that they're challenging not the basic requirement for publication review, but the manner in which four agencies have applied that requirement. But those sorts of claims are justiciable only in the context of a concrete challenge to the review of a given work in which a court would have a factual basis to assess whether the agency was reasonably applying the review process. Plaintiffs brought no such challenge to any of the past reviews of their works. And even if the jurisdiction, you know, we have many, many cases where people have standing and have legitimate judicial interests when they're faced with this. And these plaintiffs clearly are in this process. Some are withholding their publications. Others have been in it and intend to do more. These people are, are people that could write a book if, if they were allowed to, I suppose, or would want to write a book. And you're suggesting they can't challenge this policy simply because they don't have one ongoing? Well, one point on standing, Your Honor, and one more on rightness, if I may. The standing issue is that, look, they would certainly have standing, the reason Your Honor noted, to challenge the basic requirement of the publication review, which they're not doing. What they don't have standing to do is to challenge the specific alleged defects of these systems without pointing to ways in which they are harmed, not just by the basic requirement, but by those particular defects. And that is what... Do they conduct a facial challenge? Not to the specific defects without alleging how they are harmed by those specific alleged defects. And the harms they're pointing to, the uncertainty and burden of having to undergo review... Well, then you can never have a facial challenge. I'm not a fan of facial challenges. I say in the judicial system, it sounds too much like a legislative veto, but we have it. The Supreme Court has approved facial challenges in all kinds of circumstances. And so long as the people are interested in and have demonstrated sufficiently close interest in the challenge. And in this case, these plaintiffs are right in the mainstream of those affected, aren't they? Well, I think they're certainly affected by the basic requirement of the publication review. I don't think they've adequately alleged they're affected by the specific defects, but even if they have standing, there is a significant rightness issue here. And this may become clearer as we talk about the merits, but as you already heard from plaintiff's argument, plaintiff's claims in this case rely over and over again on allegations about how the agencies are supposedly applying these policies over and over again. They say on page one of their opening brief that defendant's decisions are quote, often arbitrary, unexplained, unrelated to national security concerns or influenced by office viewpoints. And there's just no basis, even at the pleading stage here to assess those sorts of sweeping allegations. What we have are the policies and the nondisclosure agreements on their face. And there is no plausible basis from those documents to the government is doing anything illegitimate in applying the pre-publication review process. And to the extent plaintiffs want to make sort of speculative assertions about- Well, I think your point's well taken in the sense that they are not able to challenge a particular practice that happened to them in the past, or that they are aware of being ongoing with somebody else. But they can challenge, I think basically, the written policy and perhaps even the agreements. I don't know. So if they had standing, which we don't need to return to, I would agree that they could challenge the policies and the agreements. But much of what they're suggesting here goes well beyond what is sort of evidence from the base of the policies and the agreements. It goes into extensive speculation about how the agencies might do some illegitimate thing like censoring information that is not classified at all or statutorily protected. It's completely officially acknowledged by the government and so forth. There's just no plausible basis to believe the government is doing any of that. And those sorts of allegations cannot justify this sort of sweeping challenge. It simply isn't right. It may make sense to move to the merits. I think some of these rightness issues may become clearer as we talk about the merits. The policies challenged here are constitutionally permissible for the same reason as the similar, if not broader, policy in SNAP. The CIA secrecy agreement at issue in that case was extraordinarily broad. It committed employees and former employees to seek review of any material relating to the agency, its activities, or intelligence activities generally. The briefing in that case, both here and in the Supreme Court, made essentially the same arguments against the provision that plaintiffs are making here. And both this court and the Supreme Court upheld the injunction requiring SNAP to comply with the agreement even as they disagreed about the propriety of a constructive trust. SNAP has been understood for more than four decades as establishing the legality of the publication review. And this court reached the same conclusion in SNAP itself and had upheld similar secrecy agreements before in Marchetti and Alfred A. Knopf. We think that, frankly, dispositively resolves this case. But even if it doesn't, it at a minimum establishes the constitutional standard of scrutiny here is reasonableness. And the challenged policies are reasonable in their scope in their substantive standards of review and in the procedures they entail for much the same reason as in SNAP. In scope, the policies are either similar to or narrower than the one approved in SNAP. There's no question that they require the submission of a broad set of material as opposed to only those publications that in the author's judgment may contain classified information. That is, I think, essentially what plaintiffs are suggesting would be constitutionally permissible. But the broad scope is entirely appropriate. No author is ever going to think that he or she is disclosing classified information, that they would recognize that there are criminal penalties for doing so. But the point of prepublication review is to let the government make its own judgment with its more extensive knowledge and understanding of what might reveal classified information. And this case reveals the importance of letting the government do that. So there are four plaintiffs here who submitted to prepublication review. They all had information redacted from their publications. They challenged the propriety of some of those redactions, but they don't suggest that they were all improper. And what that means is that four of the plaintiffs in this very case would have revealed classified information, unwittingly, no doubt, but would have revealed classified information, but for the prepublication review process that they all underwent. So that illustrates, I think, the significant importance of prepublication review to the government and to the national security. The policies are equally reasonable in the review standards they apply. Both the policies and the nondisclosure agreements make clear that works are reviewed to determine whether they disclose classified information, or in some limited instances, information that is statutorily protected, even if it's not classified. That is entirely within constitutional bounds. And I would stress in response to some of the colloquy that your honor was having with Mr. Kaufman, that the redaction of unclassified information is not a terribly significant part of this process. The information we're talking about is withheld under statutes like 50 U.S.C. 3605A as the NSA, and a similar statute, section 3507 as to OBNI, and we're talking... Just tell me briefly what it was. I was talking about what is properly redactable under both the policies and the nondisclosure... Yeah, and I was about to ask you a question, and my question basically is, does information have to be classified in order to be properly subject to prepublication review? No. So let me answer that in two ways. First, certainly information that is properly subject to prepublication review in the sense that it has to be submitted may well not be classified, right? Presumably most authors are not putting classified information in their manuscripts, and the point of prepublication review is to let the government make sure they have an unwittingly done so. I think what your honor may have been asking is, can unclassified information properly be redacted in prepublication review? And as to that, what I think I was saying when your honor was cut out was that, yes, there are certain statutes that in limited instances properly allow the agencies to redact information that may not be classified. We're talking about statutes like 50 U.S.C. section 3605A as to the NSA and section 3507 as to OBNI. These are limited authorities. They pertain to things like the names of people who work at these agencies or, you know, for example, the security protocols that might be employed for their facilities. That information isn't in all instances classified, but it's certainly worthy of protection. We're not talking here about any broad authority for the agencies sort of in a manner unmoored from any statute or from the classification authority to say that they would rather information not be disclosed. And finally, in addition to being reasonable in scope and in the review standards they apply, the policies afford authors adequate procedural safeguards, including uniformly across all four agencies, the opportunity to appeal adverse determinations within the agency, and of course, the ability to challenge review determinations in court. And they all specify a target timeline for review while allowing for longer timelines to review particularly lengthy or complex works. There is no allegation in this case that's sufficient to the four of them who've ever submitted to pre-publication review have submitted numerous works, including many shorter and time-sensitive works. They don't suggest that there's any sort of systematic pattern of delay with respect to those works. Mr. Goodwin, who complains that one book entitled, I think, Whistleblower at the CIA took 11 months to review, notes that he's written, I think, nine other books and then none of them took or most of them didn't take more than two months to review. So it is certainly true that there are limited situations where with particularly sensitive or complicated and lengthy works, it may take more than 30 days for a review process. In the recent case of former National Security Advisor John Bolton, for example, the district court in DC noted it was not at all unreasonable to take four months to review a book by a recent former National Security Advisor ubiquitously discussing his work. But of course, if authors in a given instance are dissatisfied with the pace of review and think that they need a determination and that the agency is withholding it for some improper reason, they can easily bring suit on that basis as well. The district court noted that in the Bolton case and authors do that and get relief in those cases from time to time when they're brought. So there is not any basis to conclude that these policies are unreasonable in a way that the policy upheld in SNEP was not. As the Supreme Court held in SNEP, there are reasonable means for protecting the government's compelling interest in protecting the secrecy of information important to our national security and the appearance of confidentiality. So essential to the effective operation of our foreign intelligence service. Happy to take additional questions if the court has any. Any questions of Judge Traxler, Judge Keenan? No, thanks. All right. Thank you, Mr. Keeney. Mr. Kaufman? Thanks, Your Honor. Just to respond to a few of my friends' points. You know, the government says that plaintiffs haven't pointed to harm coming from the particular features that they challenge. This is a puzzling argument because they plainly do. Overbroad censorship has led to censorship of things that are not covered by what the government can constitutionally censor under SNEP and Marchetti. Lack of binding deadlines has led to chill. Submission requirements that are extremely broad in terms of who has to submit and what have led to our plaintiffs being ensnared in these regimes when they literally have no knowledge that could be subject to proper censorship. So that argument is just simply off the mark. Second, I do want to add that you got a very difficult conceptual problem. I mean, you just can't go around the newspapers or go to your own clients and look at history and say, we're challenging this practice or that practice. Those could have been challenged at the time that the practices were enforced. What we're looking at is a facial challenge to the I think that's all the authority we have to decide. I don't think we can decide. You don't have standing to raise what has occurred in Washington. Well, I think that the relevance of what has occurred to our plaintiffs, it makes their claims reasonable in terms of It may be a hypothetical, but what has occurred to your clients might put them in the range of standing, but it does not put them in the range of our decision. In other words, we do not now have to take any one of your clients' publications. We do not now have the authority to review that. The time period for that's gone. It wasn't going up through the chain. It was not decided by our lower court. What we're looking at is a facial challenge and even a facial challenge that the government believes you're not entitled to make because of this problem. In other words, standing in rightness. But clearly, that precludes you from challenging conduct that is you've gone through in the past. I totally agree with you, Your Honor. This is a facial challenge with it before the court is the actual policy of the government. And that is what that is what we are challenging. Not I didn't hear one one argument from my colleague that the dependent policies do not do the things that I listed before things that I listed in my opening. So all of these regimes fail on those four on those four elements. I want to also focus on what SNEP is really about. It's about this remedy that is a prior restraint on speech. And that is exceptional. And so whatever the and that was important to what the court decided in SNEP and Marchetti and the way that they limited that remedy to classic things involving the release of classified information learned in the course of a former employee's employment. And that is not what defendant's policies do. So if that is the only thing that the court sees as a difference between this case and that one, the defendant's policies are unconstitutional on that basis. They also lack binding deadlines. And it's SNEP and Marchetti. The court said 30 days is a maximum. You know, my friend said that, oh, one one book took 11 months, one took eight months, but most of them are fast and you don't really need to worry about this. Well, this is why those allegations are relevant. This is these are allegations that plead that the discretion the agencies have without any binding deadline leads to additional delays in publication and censorship and the ability for the agencies to prefer certain speech to others. You know, my friend says that SNEP has been understood for decades to approve of essentially any PPR regime that the government would like to implement. Well, that's the government finding an elephant in the mouthful, respectfully. The government has certainly believed that SNEP allows them to construct 16 agencies worth of pre-publication review regimes that depart significantly from the ones that issue in SNEP and Marchetti. But that is not what the plaintiff's challenge here. The plaintiff's challenge regimes that go beyond the facts of those cases and the agreements that the Supreme Court said were reasonable in footnote three of SNEP. Last, I just want to point out, the government makes this sort of tricky argument about how since the plaintiffs eventually published things that had redactions in them, ipso facto, they would have released classified information without PPR. This is just a simply false. First of all, the plaintiffs do not allege that the government properly applied first amendment compliance censors of standards. They simply say that because of the difficulty of the system and the length that it takes to review and the unfairness of the appeals process, they simply decided to publish because it was more important that their speech reached the public than that they continued to fight over things that the government insisted. For example, Mr. Emmerman wanted to publish things that the CIA itself had published in the past. The government told him no. Well, rather than fight, he decided to simply publish. And these are things that happen to all of our plaintiffs, putting it, forced into a position where, because the policies allow for censorship beyond what the first amendment should allow, they're put in a position of engaging in months and months and months of argument and delay, or going at great expense into court to challenge one thing, rather than what they're doing here, which is saying the policies allow too much discretion. The court should order the government to bring those policies more into line with what the first amendment requires, and a proper understanding of reasonableness or NTU balancing, so that the author's interests are protected, the interests of the public are protected, and the government tailors what PPR, what it says PPR is for, to a more reasonable system, to narrow, narrowed to what its narrow interest is, in the release of, in an inadvertent release of classified information, for which this is an entirely belt-and-suspenders approach. Again, I really want to emphasize, if one of these authors, as my friend said, did ignore the recommendations of the PPR office and publish their work, and they publish classified information, the government has many, many tools at its disposal to enforce that breach. And that, as the plaintiffs have said, fled. Yeah, we understand that. That's the criminal law. And, of course, the pre-review policy is to much good if our competitors in foreign countries have the information, and we just put the guy in jail. We're trying to prevent, we're trying to protect the information. Now, obviously, your argument is saying it's too broad, and it's not sufficiently disciplined to allow for speech. That's what I understand you'd be saying. That's right, your honor. I mean, just to take one example, the CIA, my friend mentioned, though, books usually, they might take a couple of months. The CIA's policy, without issuing any binding deadline, says that books could take a year or more. Now, this is simply unreasonable. And all the plaintiffs are asking is for the court to say, these rules are too broad. They go beyond what the agreement that was issued in SNAP, the remedy that the Supreme Court approved of in SNAP, the remedy that this court approved of in Marchetti, and they need to be brought into light. And just, again, the very clearest ways the court could do that are say that censorship itself is limited to classified information learned in the course of the former employee's deployment. Second, they need to have binding deadlines so that there is some predictability and ability for plaintiffs to know and office to know how long review will take in the past, I mean, in the future. And that would, again, that was a feature of the system approved by the Supreme Court of SNAP and approved by this court in Marchetti. Third, the court could say that there needs to be some limitation on the submission requirements. Well, either are on in terms of who has to submit based on the access they had or how long ago they served in government, and also what they need to submit. And again, we're just talking about one remedy that the government has. I just want to point out another reason why the government- Yeah, I do notice your time, so start to wind up if you would. Sure, Your Honor, and I appreciate allowing me to just finish up here. One thing that I think makes clear that the government's interest is so divorced from what the scheme has become is that PPR only, the central remedy under PPR is to take the profits of an individual. And that has no deterrent effect on people that want to write an op-ed for the New York Times or tweet or write a blog for lawfare. None of these, an individual who is certain that they're not going to release classified information, most likely because they never learned that kind of information when they served in government, but they want to publish something, they're not really subject to the remedy that PPR puts in place. So again, this is a very narrow remedy and the tool that the government has imposed is exceedingly, and we say unconstitutionally broad, and that cannot stand. So thank you, Your Honor. Thank you. All right, we would normally come down in Greek Council. Do we have everybody on board? Yeah. We would normally come down in Greek Council, as you know, and we can't do that. It's a tradition that's unique to the Fourth Circuit, and we're proud of it. We would do it, and we would mend all fences as we're down on the floor shaking hands with you. We do want to thank you for your good arguments. We have two very good lawyers here today, and so the best we can do is express our appreciation now, but come back and see us again sometime, and we'll shake hands with you again. Thank you, Your Honor. Thank you, Your Honor. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Paul V. Niemeyer, Barbara Milano Keenan, William B. Traxler Jr.